My name is Patrick Scirocca on behalf of the Appellant Thomas Manguiemelli Council. The Commission's affirmation of the arbitrator's finding that the Appellant met his burden of proving exposure to carcinogens under Section 1D of the Act as a result of his employment with the Appalee were supported by a preponderance of the testimonial documentary and expert opinion and is consistent with the manifest way to the evidence in law and should be affirmed. The relevant portion of Section 1D of the Occupational Disease Act states, an employee shall be conclusively deemed to have been exposed to the hazards of an employee's occupational disease when, for any length of time, however short, he is employed in the occupation in which the hazards of the disease exist. Now, the Supreme Court in Freeman held that a worker is not required to provide any proof of the amount, time, duration, or particular exposure to conclusively prove hazardous exposure under the O.D. Act. Now, the evidence reflects Dr. Orrest identified several carcinogens to which firefighters are both germally and exposed to their respiratory systems and correlated these exposures with specific aspects of his duties. The basis was his review of specific studies, a multi-decade review of studies, and his amassed experience over the course of his work in occupational medicine, public health, toxicology, and epidemiology. Further, these studies offered upon which he relied to find the toxins and substances as carcinogens. These factual findings amply support the Commission's finding that his testimony of both the presence and exposure of the carcinogenic substances by the appellant in the usual course of his duties as a firefighter for 29 years was both credible and persuasive and not subject to rebuttal. Conversely, the appellee's expert, Dr. Elterman, conceded that he did not know about the specific exposures of the appellant or their significance. He was not aware of the common exposures of firefighters or the chemical composition of smoke or fire. Based upon the foregoing, the Commission's affirmation of the arbitrator's finding that Elterman did not have knowledge of and was unable to testify about the specific call history of the appellant over the course of his career was supported by the evidence. The Commission's adoption of this finding at arbitration at the testimony of Dr. Orrest supports the hazards of disease of prostate cancer existing in the appellant's occupation as a firefighter is well supported by the medical evidence. Now, this court in Omron Electronics found that a claimant's death related to his occupational exposure to meningitis while traveling for work to San Paolo, Brazil. The court found this case compensable despite the failure to put forth any evidence of specified exposure. In that case, the employee's medical expert cited articles in support of his testimony that travel to San Paolo increases the risk for contracting meningitis and is well known in the literature as being an area of increased prevalence of meningitis two to four times higher than the United States. In the present matter, Dr. Orrest cited both specific studies and general knowledge of studies which support the existence of the hazards of carcinogens exposure in firefighting and the actual exposure to the appellant in the usual course of his duties as a firefighter. In this matter, Dr. Orrest testified credibly about the exposure vectors of the appellant as a firefighter. He identified specific chemicals and carcinogens to which firefighters are exposed and had both an oral history and documentary history of the appellant's occupational exposure. Also handled by this court, H&H Plumbing, the main issue is whether exposure to asbestos could be inferred from the testimony of claimant's co-workers without having an expert opinion establishing exposure. The court found that the commission could reasonably infer from this testimony of co-workers that he was exposed to asbestos. Similarly, in our matter here, the proof of exposure can be inferred from the testimony of the appellant and it's corroborated and supported scientifically by the testimony of Dr. Orrest. Based on the foregoing evidence in case all the commission's finding that they is overwhelmingly supported by all the aspects of evidence and should be affirmed. Now, the commission made an error of law in misapplying the presumption determined under section 6F of the Illinois Workers' Compensation Act to this matter arising under the Occupational Disease Act. An error of law in determining the weight of the presumption afforded under 6F of the compact. In its analysis, the commission quoted favorable portions of the Johnston case, a matter where the Supreme Court, pardon me, the appellate court analyzed legislative history of 6F of the compact in determining the legislator's intended weight of the presumption under that act. In this matter, the commission then concluded based on the review and comparison of the two presumptions under the Occupational Disease Act and the compact and applied 6F as construed by Johnston Court to this matter arising under a different law, the Occupational Disease Act. Further, the commission found that our review of the case law enhances our belief that the appellate court would agree with our finding. And only some evidence is required for the appellate to rebut the presumption under 1D of the Occupational Disease Act. Now, the commission failed to indicate any of the case law it had reviewed or quoted any precedent or statutory construction in concluding the Noteworthy absences include the commission's failure to engage in any statutory construction of the Occupational Disease Act, which is what you initially should do, their failure to make reference to the statutory construction employed by the Johnston Court to support the commission's finding that the evidentiary presumption of 6F was somehow applicable to this matter under the Disease Act, their failure to analyze the appellate court's and these were all errors of law. Now, this is a matter of statutory instruction and in giving effect to the intent of the legislator, we look to the language and give it its plain and ordinary meaning as the best indication of its intent. So, the commission's analysis should have been of Section 1D of the Act, not searching for analogies interpreting a different law. Section 1D of the Occupational Disease Act means a disease arising out of in the course of disabling as a result of the exposure to the employment. Such aggravation shall arise out of a risk peculiar or increased by the employment and not common to the general public. A disease shall be deemed to arise out of the employment if it is apparent to a rational mind upon consideration of all circumstances that a causal connection between the conditions under which work was performed and the occupational disease exists. The disease need not have to have been foreseeable or foreseen or expected but after its contraction must appear to have its origin or aggravation and a risk connected with the employment and have flowed from that source as a rational consequence. Therefore, a plain reading of Section 1D of the Occupational Act means a causal connection to the employment can be inferred after the fact if it arises out of the risk peculiar to the employment and not common to the general public. The evidence of the record is are exposed to carcinogens to a greater degree than members of the general public. Such increased risks of cancer are peculiar to their employment. The Supreme Court has agreed with the statutory construction of 1D of the Act finding that it was the legislative intent that when an employee contracts a disease due to the exposures or hazards of the employment to a greater degree and in a different manner than the public, he is deemed to be suffering from a compensable occupational disease. And that's from the Alice Chalmers manufacturing case in 1965. This language reflects the distinct purpose of the Occupational Disease Act to lessen the causal burdens of proof for these gradual... Mr. Soroka, can I ask you a question? Are you reading to us directly from your brief? No, sir. I'm following you word for word. Well, I'm reading from my summarized heavily edited portion of my brief, sir, to be specific. Well, I mean, that's supposed to read from your brief, but go ahead. It's been heavily redacted. I'll speed it up, sir. Sorry. So the lessening of these burdens are in substantial contrast to the Workers' Compensation Act. The legislator deliberately used proof of hazard exposure and employment in an area where the hazard exists as a proxy for actual exposure. And a plain reading of the firefighters is that any condition of impairment caused by cancer, which causes disability, shall be rebuttably presumed to arise out of and in the course of the firefighting and further shall be rebuttably presumed to causally connected to the hazards or exposures of that employment. In the Supreme Court of Sperling, nothing in the statutory language of the Occupational Disease Act requires direct causal connection proof. They actually redacted direct, which had preceded calls of connection when they amended the act in 1975. And so they rewrote the first two paragraphs because of the nature of the malady to which they were trying to find redress for. And that was filed in Sperling and in your case, Omron Electronics. This utilization of the shall be language shall be rebuttably presumed to be causally connected to the hazards. Shall be reflects a strong assertion or intention that causation of exposure must be presumed. Further, they enumerated cancer as a presumptive condition related to firefighters because they recognized that they had special risks. In this matter, the legislator's five distinct deliberative separate reductions in the telling, presumed exposure, presumed arising and out of the employment, presumed causal connection, and cancer as a presumptive condition. This reflects clear legislative intent to distinguish the act from the Compensation Act. And the explicit clear legislative enactments were to aim to protect firefighters who succumb to insidious disease processes and strongly rebuts the commission's finding that they found no substantive difference regarding the rebuttable presumption between the two laws where the language is just so clear. So we feel that the commission committed legal error in finding a course construction of an evidentiary burden under the Workers' Compensation Act to be substantially similar and applicable to this case, which falls under the Occupational Disease Act. And also the Johnson court, which they quoted, stated that were composing policy considerations or issue, the party attacking presumption as a greater burden of production than merely producing evidence sufficient to rebut. That they reflected that when policy considerations are higher, which they certainly are under the Occupational Disease Act, Johnson discussed the compelling policy interest and the higher burden of rebuttal production given to the attacking party. And if the court seemed to overlook that the commission seemed to overlook that in their decision. So the language clearly distinguishes the legislative intent between the two acts and may explain the commission's error of law in substituting a weaker evidentiary presumption under the Workers' Compensation Act and determining causation in a matter arising under the Occupational Disease Act. And so we feel this is error and that the appellee should be held to a higher standard of a stronger presumption and a higher production to rebut that presumption. The commission is finding that the appellee put forth sufficient evidence to rebut the presumption of when the act itself was contrary to law and against the manifest way to the evidence. The issue is whether the appellee put forth sufficient evidence to rebut. This is a mixed question of fact, reviewing choice of law and its application to the facts. So we feel it's a de novo standard of review. So without waiving the application argument, if one were to argue the matter involved only a question of fact, the commission's determination of the evidence would still be against the manifest way to the evidence. So employing the presumption under 1D, they have a higher, the challenging party must overcome a strong presumption by clear and convincing evidence. The commission's, the appellant argues the commission's failure to adopt the presumption by a statutory construction of the Occupational Disease Act was legal error. The commission reversed the finding at arbitration and found the appellee rebutted the appellant's presumption under 1D of the act based on the testimony of Elterman. Let me stop you for just a second. In regard to your understanding of why the commission found the way it did, the Dr. Elterman, was he ever, did anyone ever question his credentials as far as being an expert? Well, me on cross-examination. I mean, he was a garden variety urologist dealing with BPH, urinary issues. He was, had no degrees, no publications in oncology. He didn't treat cancer patients. He had no background. I did, the dissent and the commission did, Thomas Terrell did in the dissent. I can read that for you if you need be. And he was vigorously cross-examined and demonstrated to have, I mean, he didn't know what the median age for U.S. Caucasian males was for contracting prostate cancer. He didn't know, he didn't know what firefighters were exposed to. He didn't know the toxins they were exposed to. He had no call history. He just thought that he went on fires once in a while. Was there any objection to his giving testimony as an expert witness? I'd have to go look back at my brief, but yeah, I believe I objected on the basis of foundation a few times, but it would be impossible for me to go through 4,000 pages of records and find that for you. My brief speaks to those things. But he was criticized by the arbitrator and the dissenting commissioner, to answer your question. So anyway, Dr. Elsterman's basis was that he had a father who caught prostate cancer, but he caught it at 72, which is the median age, and he died of natural causes at 94. And petitioner, the appellant, Mr. Mangiamelli, he had a high PSA in his 40s and contracted it at 56 years of age, which is consistent with the literature in Kukawa, in Daniels, in Le Masters, in the World Health Organization, showing excess risk of prostate cancer among firefighters, 45 to 59 years old. And the petitioner had the PSA and was diagnosed within that younger cohort, consistent with the medical literature. And so that was demonstrated- Mr. Soroka, red light's on, your time is up. Thank you, sir. Mr. Newman, you may respond. Well, thank you, your honor. Yes, the commission did find that Mr. Mangiamelli had been exposed to carcinogens as a broad category, but there was no specific explanation why any of those carcinogens would cause prostate cancer in the absence of any other cancer. And it was made plain in the record that Mr. Mangiamelli was scanned for any other cancer and he had none. So, Dr. Orris, in his testimony, said that there was no explanation of any mechanism why or how a man like Mangiamelli would have prostate cancer due to exposures as a firefighter in the absence of any other cancers. He didn't have skin cancer, he didn't have cancer of the respiratory system, he only had prostate cancer. And again, there's no explanation why a man would get prostate cancer from work as a firefighter and not any other cancer in the same person at the same time. So, if we go back to the issue- May I ask a question? How did Dr. Orris address that issue? By saying, at page C459 in the record, that he didn't have any explanation for how, for any mechanism of the cause of cancer in this man, or in anyone's prostate cancer, based on work as a firefighter. He just admitted he didn't have an explanation. So, that refutes the idea that it was apparent to a rational mind that there was a causal connection between work as a firefighter and having prostate cancer. Yes, so if we look at the presumption under Section 1D of the Occupational Disease Act, it's a rebuttable presumption, first of all, not a conclusive presumption. Council said that wrong in this first reading. It's a presumption that a firefighter with more than five years experience, if he has cancer, his occupation was a causative factor. But what is needed to rebut the presumption? That's a key question. Some evidence of another cause is sufficient under Simpson v. Workers' Compensation Commission, 2017, Illinois Appellate 3rd, 160024WC. Now, there's identical language in Section 6 after the Workers' Compensation Act, and it was interpreted under Johnston v. Illinois Workers' Compensation Commission. The rebuttable presumption creates only an ordinary presumption. It can be rebutted when the opposing party introduces some evidence to rebut the presumption. Then the presumption bursts like a soap bubble and vanishes from the case. Mr. Newman, we know what the rules are for rebuttable presumptions. What is required? Do you have to introduce evidence that something other than the exposure as a firefighter was the cause of the prostate cancer? Or is it sufficient for you just to say that there are other factors that could have caused? Well, in this case, the other factor was heredity. You didn't answer my question. Do you have to introduce evidence that something other than his work as a firefighter was the cause? Or is it sufficient for you to merely say that other things can cause it? Well, I think that the rebuttal was sufficient because Dr. Alterman said that those who are sons of fathers who had prostate cancer are more than themselves. Is that evidence that something other than his work as a firefighter was the cause of his cancer? Yes, it's evidence that hereditary, excuse me, evidence that heredity was his cause. Well, did he say heredity was its cause? He said heredity. What did he say exactly? He said that the risk factor, excuse me, he said that, let me see if I can get this correct. He said that the standard incidence ratio of those whose fathers had prostate cancer is 2.12 compared with the general public. So, a man whose father had the general public to develop prostate cancer himself. Is that to say that this man's cancer was not caused by acting as a fireman? Well, yeah, I think so because what Dr. Alterman also indicated and testified to from the studies that the one called mortality and San Francisco, Chicago, and Philadelphia, 1950 to 2009 showed a standard incidence ratio of 1.03. So, the incidence ratio between the incidence of prostate cancer in firefighters compared to the incidence of prostate cancer in men in the general public is just about one. That means about equal. So, the firefighters really don't get this prostate cancer at a higher interval than the general public. The other study that he showed, which is the follow-up exposure response relationship for select cancer and non-cancer health outcomes in a cohort of U.S. firefighters from San Francisco, Chicago, Philadelphia, 1950 to 2009 divided the firefighters into three subgroups. And when they compared them, the subgroup that went to the most fires had actually less incidence of prostate cancer than the general public of men. It was 0.91 compared to one. So, they had less. The guys who went to the most fires actually had less prostate cancer than the general public. Is there any study, Mr. Newman, that subgrouped by heredity for firefighters? I don't think, I don't know if there is one, but I don't think it's in the record if there is. Would that be helpful in these firefighter cases? Probably, it would be helpful. You know, if we knew that, if that study had been done, yeah, we'd be talking about that, I'm sure. But I don't believe that that study's been done or at least not found and put in the record. Thank you. And also, I feel that the rebuttable presumption was rebutted by Drs. Kuga and Mehta, who wrote off-work notes saying the prostate cancer was an, open quote, off-duty, close quote, illness. So, you had the two treaters saying that this wasn't a work-related illness. So, I think that there was plenty of evidence to rebut the presumption. Then the next question was whether the commission, finding that the preponderance of the evidence was not in favor of the claimant, well, they compared Dr. Orr's testimony to Dr. Alterman's. Dr. Orr's testimony statistically referred to older studies than the one referred to by Alterman, and they were smaller studies. The one cited by Alterman had 20,000 subjects in it. And as mentioned before, Dr. Orr's was unable to explain any reason at all why a firefighter's exposure could cause prostate cancer in the absence of any other cancers in the same man. That's at page C959. The commission noted that statistically, well, the commission noted that correlation is not the same thing as causation, and that there was no reason to explain why the firefighter's work would cause this man to have prostate cancer. So, the standard of review on this issue is whether the commission's decision is against the manifest way to the evidence. And it's not- And can I ask another question? Did Alterman actually opine that the claimant's prostate cancer was not related to his employment as a firefighter? Did he issue that opinion? Yes, I believe he did. Well, tell me whether he did or didn't. Yes, sir. So, I don't have the page number in my notes, but I can go back and look. I'd be happy to go back and look. All right, I'll find it myself. Yeah, I believe that Alterman said that this man's cancer did not arise out of his firefighter's work. I think he said that explicitly. Based on correlational studies? Based on lack of any... Well, what he said was that based on the studies that show that firefighters really don't get this disease at any higher rate than the general public, based on the fact that there's no explanation why inhalation exposures or skin exposures would cause prostate cancer in the absence of any other cancers, and based on the hereditary factor that sons of fathers who had prostate cancer 2.12 times as likely to gather prostate cancer as general public, all these things taken together, Dr. Alterman's opinion was that this man's cancer didn't arise out of his occupation as a firefighter. But we don't have any studies that have the subgroup of firefighters with that DNA, alleged DNA factor of fathers having cancer, that it occurs earlier or more invasive. Right. I don't think we have exactly that study. So I'm asking this honorable court to affirm the decision of Judge Duffy. I thought his decision was very well reasoned on the issue of the presumption and that the commission's decision was not against the manifest weight of the evidence. Any further questions from the court? No. Okay. Thank you, Mr. Newman. Mr. Soroka, you may reply. First off, there was never any question or issue of prostate cancer being present or not present in the absence of cancer. That question was never posited to Dr. Orris. That was never an issue discussed anywhere by any expert, close quote, categorical statement. Secondly, the Daniel study, there was no discussion by Alterman about any subgroups. Counsel's comments on these are the first time it's ever been explained in the record. So let's be clear there. Secondly, the Daniel study, which was quoted and relied upon by Dr. Alterman in its introduction, quoted LeMasters, a meta study, as well as the WHO, International Agency on Cancer Research. Both of those studies, which were meta analysis of over 48 studies that demonstrated- Counsel, you said Dr. Alterman cited them? What did you mean? Yeah. Dr. Alterman cited the Daniel study. Thank you. But all he could mention was a standard incidence ratio. He was not conversant in it. And there was never any discussion of subgroups. But most tellingly, while he didn't know what he was talking about from the study perspective is, in the first paragraph or the first few introductory paragraphs, it quotes, the Daniel study quotes LeMasters and the WHO study, which were meta analysis of 48 studies finding excess prostate cancer in firefighters, 45 to 59, and stated that their findings of the studies. And he was cross-examined with that. And he had no explanation and could not rebut that fact that appeared in his own study. So let's be clear about that. Also, he had no information about family history. He never stated, he never negated the firefighting exposure as a reason or not a reason for the prostate cancer, never spoke about it. What he did say is that he does believe that firefighters are exposed to carcinogens and that the family history does not negate the effect of occupational exposures, which could have played a role and that he would change his opinion if he got that information, but he felt that it didn't exist. Now, Dr. Orris said that 10% of all prostate cancers have a family history, only 10%. And all I have to show under the Causal Connection under the OCK Act or, well, the OCK Act, I'll stay with because that's the one we're dealing with, is that all I have to show is the exposure was a causative factor among others. I have no obligation, the opponent has no obligation to explain away or rebut family history. All that we have to show is that the 29 years of exposure as reflected and testified to by Dr. Orris, by vector, by chemical, was a causative factor in his condition. And his manifestation of the cancer is consistent with what was in the medical literature as happening 12 to 14 years earlier than the median age. I asked you to look behind Elterman's opinions. He actually agreed that the Daniels and Lemasters study demonstrated an excess incidence of prostate cancer in firefighters 45 to 59. He ultimately conceded that issue, period, end stop. And also, he had no understanding of the exposure. He had no understanding of the composition, chemically, of smoke or fire. He had no idea of the petitioner's history of actually working as a firefighter. He was doing this all based on the idea that he went to a varied number of fires and that was it. But he had no experience in epidemiology. He's an oncologist treating prostates for BPH, not for cancer. And so he didn't have any of those things. Also, correlation versus causation. Once again, 1D correlation is actually causation. The act itself does not push the burden on the injured party to show causation to the exposure. That was the whole point of the act, that if you show the correlation of the exposure at work through studies and medical testimony, then you've satisfied it being a causative factor in contracting cancer. Thank you for your attention. And where the work status slips from the two doctors of MEDA, nowhere in the medical records themselves is there any opinion on causation. The only reason Mengi and Melody said that this is not work-related, he was there said to him, is because he was deathly afraid of not getting his cancer treatment paid by his health insurance and dying from prostate cancer. I mean, he had his metastasized lymph nodes, they were removed to such an extent that he had to get a prosthesis for his male organ to be able to have Congress with his wife. I mean, he was afraid for his life. And that's why he told his doctors it's not work-related, because he knows once you say that, then the group health insurance stops covering your cancer treatments. But nowhere in the medical records does it reflect any treating doctor commenting on causation. And thank you for your patience. Okay. Your time is up, Mr. Scirocco. Thank you. Questions from the court? No questions? No? Okay. Thank you, counsel, both for your arguments in this matter this afternoon. It will be taken under advisement and a written disposition shall issue. Clerk of our court will escort you out of our remote courtroom at